Good morning, your honors. May it please the court. My name is Jason Hannan. I represent the juvenile appellant in this matter. I'd like to start with and focus on, if I may, the initial statements that the juvenile made to law enforcement shortly after an agent threatened to jail her grandmother if she did not tell him the truth. This is the initial statement that was taken at a secondary inspection area of a temporary immigration checkpoint. And it is the statement to the effect of which, OK, yes, I do have something on me. As a result, the agent searched her and found drugs strapped to her body. Wait a minute. You say as a result, you said as a result, the agent searched her? Yes, your honor. As a result of what? Your honor, the juvenile, after having denied having drugs on her about three or four times, then relents. I know, but before that, though, they had a dog sniffer positive, right? So it's hard. Did the agent say I searched her as a result of what she said? No, your honor. That is a legal argument I am making, that as a result of her statement, the agents then told her, we're going to go ahead and search you, which they did. I argue that that is the fruit of the statement and that it should be suppressed. Tell me if this is correct, that before they searched her, they told her they were going to get an agent over to search her, but they didn't actually call the agent until after she made a statement. Is that the order of events? Your honor, the record is rather unclear. We have an agent who simply says, well, we're going to have an agent search you anyway. Well, is that... When was that statement made? Your honor, it appears that it was made right about the time that he made the threat about jailing her grandmother. So that's before she told him that she had the drugs? Your honor, I would not concede that point because the counsel for the government then asks, well, but before you told her you're going to search for, or that you're going to get an agent, what did you tell the grandmother? And it's really unclear whether the statement was made before or after. You know, in some sense, I suspect the issue the Court is getting to, obviously, is harmlessness. Would the search have been conducted anyway? And I have a number of responses to that. First of all, procedurally, I would like to point out that the government never pled inevitable discovery and inevitable search, either in their pleadings before the district court or in its answering brief. In none of those places has the government argued, nor did the district court find, that this search was inevitable or that it would have been independently discovered. So are you arguing that the government waived inevitable discovery? I am, your honor. Secondly, as a substantive matter, although the court made no ruling on the issue of the search specifically, it did say, I believe that there was no probable cause to arrest the juvenile until after the statement and after the drugs were found. Now, does this mean it would suggest, since probable cause was required to search her, that there was no probable cause to search? Also, your honor, both counsel for the government and the court stated that, well the court said there was no probable cause to arrest the juvenile until after the statement and after the drugs were found. Now, just a minute. Probable cause to search. Well, they didn't search. Correct. So what does the probable cause argument go to? Well, your honor, I have to say, I mean, because the issue was procedurally waived, it really was not addressed. But I'm trying to draw, at least from the record, that because the court said there was no probable cause to arrest, there was likely no probable cause to search. And there are some specific things that the court had said that if the court is going to reach the issue, despite the fact that there is probable cause or not, well, whether probable cause required depends partly, does it, on whether this was a border station? And, your honor, I think that's an important distinction. And I want to make this very clear because I don't think it was made clear in the briefing. This was not a border crossing area. Did you virtually concede that or whoever argued this in district court on behalf of the defendant? Or concede that this was, you know, equivalent to a border search? Your honor, defense counsel, the court, and counsel for the government were mistaken on the law on this issue. Well, it doesn't mean you didn't waive it just because you were mistaken. Well, your honor, the issue made no. I mean, maybe, you know, the government was mistaken when they waived inevitable discovery. Well, your honor, and I understand the court's point. Let me say that it made no difference to the court's decision because it made no decision on the issue of search. All of that discussion that the court's referring to and that I'm referring to right here is a discussion about whether there was probable cause to arrest. The defense was trying to move that time forward period forward by its arguments. The court and counsel were resisting it. Obviously, on that issue, defense counsel is stating, well, we think there was probable cause to arrest at this point in time. But in fact, what the court did is rejected defense counsel's argument and said there was no probable cause to arrest. So the issue being addressed there was Miranda and not the search issue. Additionally, I would point out in this area that this was not a border crossing area. This is a temporary immigration checkpoint near Amato, Arizona. Suppose it was the equivalent to a border crossing. Then we're not talking about probable cause, are we? My understanding is that if this were a port of entry case, that then the border  And I think that some type of reasonable suspicion, at least, in order to detain her beyond ñ in order to search would be required, unless it were an intrusive search. And then probable cause may be needed. But, Your Honor, I have to stress ñ But wouldn't the dog sniff be enough? No, Your Honor. The government counsel and the court both stated, well, this could have just been the odor of marijuana around her. Maybe she had handled drugs earlier, et cetera. The court found that there was ñ and government counsel conceded that there was not probable cause to search her. Well, I have to say, I don't know the answer that if a ñ the dog alerted to the seat where she had been. Now, whether that's reasonable suspicion to then conduct a search of her body, I would say ñ and I certainly can't ñ I'm not going to concede the point, but I don't have a response to the law. Partly, this discussion never took place. It hadn't been addressed in the briefs by either party. It hasn't been addressed by the district court. So I do think, in some sense, I have to go back, that this was procedurally waived by the government, that there was going to be a search anyway of the juvenile. Mr. Hannon, I see your time is running down. I'd like you to address another issue. Assume ñ not just assume, because I don't want you to take the time to argue, but the juvenile delinquency act was violated. All right? In your view, what does that mean? Your Honor, in this case, the violations were egregious enough that the adjudication should be reversed. Three-and-a-half-hour delay between calling the mother, didn't allow the mother Miranda rights before talking to the juvenile. To assume, it said, don't argue it, just give us an answer. So when you say it should be reversed, are you saying it should be reversed per se? Your Honor ñ Regardless of harmless error? Regardless of harmless error is the first argument, yes, Your Honor. Okay. And if I may ñ How would that be so? In other words, why isn't it subject to harmless error analysis? Well, Your Honor, it is if there's no constitutional violation. Then it becomes a statutory question. But the court has broad remedy in this area to get ñ to make this juvenile delinquency act have teeth, because currently it doesn't have any. And if I could ñ I want to answer the court's question, but I'd also like to reserve a minute of time. All right. We're going to give you a minute. All right. Thank you. You said the violation was so egregious. What's the consequence of being so egregious? Well, the consequence, Your Honor, and as the court stated in these ñ in some of these juvenile cases, the Juvenile Delinquency Act needs to be enforced. And the court has the power and has used that power to make sure that that happens, not just in this case, but in future cases. All right. Well, you also ñ you said a couple of things, and I'm trying to get the legal ñ your legal argument. You said if it's a violation of the juvenile ñ the Juvenile Act and it's egregious and ñ are you saying it's a constitutional violation as well? Your Honor, that is the first argument. And secondly, I would say it was a statutory violation. Okay. Well, let's get a ñ understand your first argument. Your first argument is if it's a violation of the Juvenile Act and the Constitution and egregious, then the consequence is what? Not all of them are required. And I'm sorry to ñ I said they're required. But, yes, the remedy that we are asking for ñ The remedy. No, not the remedy you're asking for. What is the remedy at law? At law, if there's a constitutional violation, the adjudication can be reversed. If there's only a statutory violation and there's prejudice, the court can reverse. Thirdly, if the court believes that the act needs to be enforced because the violations were egregious, it can also reverse. By reverse, you mean regardless of harmlessness. Regardless. Because it can be ñ all right. Thank you. Thank you, Your Honor. I will give you a minute. I appreciate that, Your Honor. Good morning. May it please the Court, Celeste Corlett here on behalf of the United States. The district court did not err in denying the defendant's motion to suppress the statements, and it did not clearly err in its findings to support that order. At the checkpoint, it is a different in-custody standard as opposed to the other cases. Was this a checkpoint that was equivalent to a border? It's a checkpoint. I wouldn't say that it's equivalent to a border, but there are special circumstances at a checkpoint, and that is that there still must be something more than detention. Angwin said there must be a physical confinement. And here that wasn't the case. What case is that? United States v. Angwin, A-N-G-U-I-N. And in Bravo also, the Court said that it's not a free-to-leave standard, as defense counsel relies upon and keeps arguing. This Court said in Bravo it's more than simply a free-to-leave standard. Instead, the detention and questioning during our standard searches, that that's reasonable at borders, and Angwin extends that on to checkpoints. That people expect greater intrusions into their privacy is also what Bravo indicated. And in this particular case, the intrusion into this juvenile's privacy was much less intrusive compared to the juvenile case of R-A-A and also the case of Bravo, in which this Court found that the person was not in custody at the time. In R-R-A, the juvenile was taken out of the car. They were brought inside of a building. They were frisked. And in Bravo, they were also, in addition to that, they were also handcuffed briefly from the point of the car to the station. You're arguing now, I assume, whether or not the Miranda warning was required, right? Right. All right. Now, but aside from that, doesn't the defendant also argue that even putting that aside, the confession was involuntary anyway? That is what defense counsel argues on appeal. First, the evidence supports that this was a voluntary statement. This was a situation in which the juvenile was not isolated from her family. Instead, she was standing with her family, with her grandmother, with her cousin, while the agents talked to her. It's also out in the open. It was in public. It wasn't in an office. It wasn't as the case defense counsel relies on Baran, where they're out in a field in some isolated area. This was an area the public was constantly going by. It was at a checkpoint. They were out in the public. Additionally, the testimony was that she was calm, that's at ER 77, that she was casual at ER 159, that she was cordial, that there was no crying, no shaking, no evidence that this was not voluntary. There was some nervousness, but the agent testified that that was the average nervousness that you would see with the person whose car was being examined. And again, the case defense counsel relies on Baran, that was not at a checkpoint. That's a different standard of being in custody. And additionally, this court said that an important part of Baran was the psychological coercion was because he was isolated from family and friends. This is the exact opposite in this case. She was with her grandmother. She was with her cousin all during the time of this questioning. Additionally, the juvenile did make some statement about the grandmother. This wasn't the juvenile made a statement or did the officer make a statement? The officer made a statement about the grandmother. And the juvenile, when she herself, she walked away from her family members to the agents on her own, and that's when she told them that she had something else on her. But she said that the reason she wanted to do this was to protect her grandmother. Now, this could have been interpreted that it was because of what the officer said. But if you look further at what happened after they found the drugs on her, the agent discovered the drugs on her, and after she knows that they've discovered the drugs, she tells the agent, don't tell my grandmother because she's sick. The juvenile knows the grandmother has drugs on her. This isn't a juvenile who's being coerced. This is a juvenile who's trying to be clever, who's trying to still. You say the juvenile knows. I mean, did she admit that later? Yes. That she knew her grandmother had the drugs, what, because they got them at the same time or something like that? Yes, that they had both gone to the same location and taped the cocaine to their legs before they came across the border. In addition, this court had found in particular that statement of the juvenile, don't tell the grandmother, that he found her not credible in part because of that statement and that she was still trying to fool the officers. If a checkpoint is not the equivalent to being at the border, why would there be any different standard at all? Well, this court has found that there is a different standard at a checkpoint, that while at a border the officers don't need any reason to look at a person's vehicle, at a checkpoint they need at least an articulable suspicion, and that's exactly what they had. They had a dog alerting to a car. Then they had the dog alerting specifically to her seat. So they had at least articulable suspicion and we would argue they had reasonable suspicion to continue their investigation and to ask her brief questioning. And, again, this was only 10 to 15 minutes of questions. It wasn't constant questioning. It was sporadic. They would talk to the family, then walk away, then come back and talk to them. They were left alone at times. So it wasn't a constant interrogation at all. It was just briefly asking questions of the juvenile and the family. As to the issue on whether or not the government is arguing that the district court did not err in its finding that the parent was properly notified of its rights, as this court has said the purpose of notifying the parent of their rights and having an opportunity to be with the child is to ensure meaningful protection, and that's in the case of CM and RAA, and also to make advice and counsel of an adult available to juvenile, and that's in Doe of 1999. And that's exactly what happened here. As soon as the drugs were discovered, she was provided her Miranda rights. No one spoke to her again and questioned her until her mother was there. And when her mother arrived, they allowed the mother and daughter to speak to each other. They had time together, first by themselves, then they advised them verbally of their Miranda rights in Spanish, then they provided written Miranda rights also in Spanish. Both the juvenile and the mother read those. Both of them waived their rights and agreed to speak to them. And this is so far different than all of the other juvenile cases on which defense counsel relies, in which the parent wasn't even notified or the parent wasn't notified of their rights. The best one was Wendy, and that was even a bad situation. In Wendy G., where the parent was notified of the rights, but when asked when she could see her, she was told it wasn't, she wouldn't be able to see her until the next day. And in this case, the officers ensured the... The district court concluded there was no violation of the Juvenile Delinquency Act, right? Correct. But you seem to, I would say, almost concede in your brief that there might have been, but assuming there is, you think a harmless error analysis applies here? If we implied that, I did not mean to imply it in my brief that there was a violation of the JDA, but even if there was a violation, first there would have to be a... There would also have to be showing of a violation of her due process, and that there was some violation of the fundamental fairness in the situation, and there was not. And as to harmlessness, her statements did not, as we indicated, they were not even included in the information that she... And we argued this also to the court. You don't need to cut to include the statements when she gets the drugs. I mean, she confessed and said, I have the drugs. Actually, she did not say she had the drugs. What she said is that she had something on her, and they asked her what it was, and she said she didn't know. And so it wasn't until she was searched and they found the drugs that then they knew that she did have drugs on her, and they appropriately gave her her Miranda rights. But even without all of that, we know that she knows that she has knowledge. Those drugs are taped to her legs. She knows that there's drugs. The drugs are similarly taped. Cocaine is also similarly taped to the grandmother's legs. They're both in the same car together. And to support the conspiracy aspect, and the officer had testified that this was an amount for distribution and not for personal use. And so all the elements of the offense could have been proved without any of her statements, either. What about your opponent's argument that you waive the inevitable discovery point? This is the first time I've even heard that. I don't believe he brought that up in either of his briefs. Did anybody rely on inevitable discovery up to now? I don't recall. As I said, because it wasn't brought up in the briefs, I. So why would he say it's waived if you weren't relying on it? Why would he say it was waived if we were not relying on it? Yeah. Honestly, I don't understand his argument because it hasn't been presented in the briefs. I haven't been able to prepare for that, although I'd be glad to. You've never argued inevitable discovery, right? Well, what we did argue to the court is that even without her statements, the drugs would have been found. They had already called the officer to come in to search her because it was only males at the checkpoint. I thought they hadn't called the officer until afterwards. No. Vasquez was called to the scene at the beginning to come and search the juvenile because they did believe she had drugs taped to her, although they didn't know for sure. That wasn't brought to check the record, was it? And I see my time is up. But were there any other questions from the court? Thank you. Okay. Don't worry. You'll have your minute, but let me ask you a question. Yes. An issue here seems to be when they were required to give the Miranda warning. If it was given in a timely manner, then there's not a violation of the Juvenile Delinquency Act, except possibly for the delay in calling the mother. So could you explain why there was a violation of the obligation to give a Miranda warning in your view?  Thank you, Your Honor. Judge, by the time that she makes a statement that, yes, I do have something on me, she has already denied it four times, that's when the agent ratchets up the pressure. He says the dog doesn't make mistakes. He says, do you want to jeopardize your grandmother going to jail unless you tell us the truth? They've taken her immigration documents and they've not offered to give them back. She can't go anywhere. She is restrained physically. She's restrained legally from going anywhere. And she's restrained psychologically. The agent has made clear that she is a puppet because he then uses the grandmother to interrogate her, threatens to put the grandmother in jail. That is all what has happened by the time she makes the statement. He uses the grandmother to interrogate her. Well, Your Honor, the grandmother was present when he makes the threat to throw her in jail unless she tells him the truth. But then he also takes her and says, well, you ask her. You question her and ask her if the drugs are on her. So he actually uses the grandmother. The agent exploited this fundamental family relationship to induce a confession. And so it violated Miranda because by that time she's not free to leave, and it also overbore her. Your Honor, what's your response to the government's citation to Anglin that at a checkpoint, custody requires actual physical confinement? Your Honor, this is not a border. My response is that this is not a border point. In fact, United States of your T's. I don't think she said border point. She said checkpoint. Right. Well, probable cause at a temporary immigration checkpoint within the interior of the United States, probable cause is required to search, and probable cause is required to arrest. You're not answering my question. My question is how do you distinguish Anglin, which says at a checkpoint, in order to amount to custody, to require Miranda warning, physical, actual physical confinement is required? Your Honor, I believe Anglin was a border port of entry case. Your Honor, in any event, I agree that if this was a port of entry case, that something beyond the temporary detention of doing the search for immigration purposes is needed. But that was here because of all the interrogation that had taken place of the two of you. If Anglin is a temporary checkpoint, then are you saying that custody could be established through more than or less than actual physical custody, could be established by the circumstances in this case or not? Custody can be established because the agent set up a circumstance under which no reasonable person would believe they're free to leave. Based on her, she had already denied it several times. They had already taken her immigration documents. They had already threatened to place the grandmother in jail. Those circumstances are what created the violation of the standard, that no reasonable person would believe they're free to leave at that point. She wasn't going anywhere. She had denied it already. They had already inspected the car. They had already taken pains to make clear that she was not free to leave that situation. And I believe my time is up. Thank you. Thank you. This discharge will be submitted.
judges: Hug, Reinhardt, Tashima